JANICE FLUITT

VERSUS

CHRISTUS HEALTH CENTRAL LOUISIANA D/B/A ST. FRANCES CABRINI HOSPITAL

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF RAPIDES, NO. 03-04778,
HONORABLE JAMES L. BRADDOCK,
WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, J. David Painter and James T. Genovese, Judges.

**AFFIRMED.**

Genovese, J., dissents and assigns reasons.

Edward E. Roberts, III
Neblett, Beard & Arsenault
Post Office Box 1190
Alexandria, LA 71309
(318) 487-9874
COUNSEL FOR PLAINTIFF/APPELLEE:
     Janice Fluitt

Kathryn Flower Van Hoof
Van Hoof Law Firm
Post Office Box 339
369 Lamourie Road
Lecompte, LA 71346
(318) 776-4836
COUNSEL FOR DEFENDANT/APPELLANT:
     Christus Health Central Louisiana d/b/a St. Frances Cabrini Hospital

PETERS, J.

Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital (Cabrini) has appealed a judgment which awarded its former employee, Janice Fluitt, workers' compensation disability and medical benefits for injuries she sustained while working in the course and scope of her employment with Cabrini. For the following reasons, we affirm the judgment in all respects.[1]

## DISCUSSION OF THE RECORD

Ms. Fluitt began working for Cabrini soon after she obtained her nursing license in April of 1997, and in August of 2002 she was still employed by Cabrini as an oncology nurse. This litigation arose because Ms. Fluitt claims to have injured her left knee on August 17 and 18, 2002, while in the course and scope of her employment with Cabrini. When her employer refused to compensate her for that injury, Ms. Fluitt filed a claim for compensation asserting that she suffered a compensable injury to her left knee on August 17, 2002.[2] She filed her claim on July 3, 2003, and the matter went to trial before the workers' compensation judge (WCJ) on January 20, 2005.

At trial, the WCJ heard the testimony of Ms. Fluitt and three other witnesses. However, no physicians or other healthcare providers testified, and all of the evidence with regard to the medical issues was provided by extensive medical exhibits filed by both litigants. After completion of the evidentiary portion of the trial, the WCJ took

[1]We observe that in her appellate brief Ms. Fluitt requests that we reverse the workers' compensation judge's denial of penalties and attorney fees. She also requests that we award additional attorney fees for work done on appeal. However, we have neither an appeal nor an answer to Cabrini's appeal on behalf of Ms. Fluitt. Therefore, Ms. Fluitt's requests are not properly before us, and we may not consider them.

[2]In her original filing, Ms. Fluitt asserted that she had also sustained a work accident on June 28, 2002, when she was exposed to a strong chemical air freshener used in her work and that the exposure caused her to suffer asthma attacks. However, that issue is not directly before us in this appeal.

the matter under advisement. In its March 11, 2005 oral reasons for judgment, the WCJ found that Ms. Fluitt sustained a compensable injury while in Cabrini's employment and awarded her indemnity benefits and medical expenses, but denied her claim for penalties and attorney fees. The WCJ executed a written judgment on May 23, 2005, awarding Ms. Fluitt temporary total disability benefits (TTDs) in the amount of $398.00 per week for the period beginning on August 18, 2002, and terminating on December 17, 2002; supplemental earnings benefits (SEBs) in that same weekly amount from December 17, 2002, until further orders of the court; and medical expenses totaling $26,032.61.

Cabrini timely appealed this judgment, asserting the following assignments of error:

1. The Office of Workers' Compensation erred in factually determining that the last day of work on August 18, 2005 [sic] was due to knee problems and that a knee injury occurred at work on August 17, 2002 and on August 18, 2002, when that finding is unsupported by the record.

2. The Office of Workers' Compensation erred in factually determining that chiropractic treatment for the left knee was for the claimant's husband, and thus failing to consider all chiropractic evidence, when that finding is not supported by the record.

3. The Office of Workers' Compensation erred as a matter of law in determining that the burden of proof is on the employer to show there is no disability.

4. The Office of Workers' Compensation erred in awarding temporary total disability benefits for disability and medical benefits during the period [sic] August 18, 2002 through December 17, 2002.

5. The Office of Workers' Compensation erred in factually determining that light duty work was not available as of December 17, 2002 and in awarding SEBs from that date and continuing thereafter and medical benefits, a finding which is not supported by the record.

2

**OPINION**

The evidentiary record establishes without dispute that Ms. Fluitt worked a complete shift at Cabrini on the weekend of August 17 and 18, 2002. She testified that while working on August 17, 2002, her left knee buckled under her as she walked up a ramp in the hospital to retrieve medicines sent from the hospital pharmacy to the floor where she was working. When her knee buckled, she "caught" herself on the adjacent handrail and continued up the ramp. She did not recall whether she reported that particular incident to the charge nurse or supervisor,[3] and she completed her shift without further incident.

The next day, according to Ms. Fluitt, her knee buckled three additional times. The first time that day occurred at approximately 9:30 a.m. as she maneuvered through several obstacles in a patient's room to turn on a light at the patient's request. The second time occurred at approximately 2:00 p.m. while she was in the restroom. The third time occurred at approximately 5:30 p.m. as she walked from the nurse's station to a table used to make entries in patient charts. On each of these three occasions, a clearly audible popping sound emanated from the knee as it buckled.

Ms. Fluitt testified that she immediately reported the first August 18 incident to Lynn Durr, the charge nurse on duty. She did so because immediately after the knee buckled, it began burning. However, according to Ms. Fluitt, Ms. Durr did not prepare a written incident report because the staff was extremely busy at the time. Ms. Fluitt completed her shift, but the next morning her knee was extremely swollen

---

[3]Ms. Fluitt testified that hospital policy required that she report any accidents to the charge nurse on duty at that time. The charge nurse was then required to prepare a written report for submission to the appropriate supervisor.

and the accompanying pain prevented her from walking or even placing any weight on her left leg. Ms. Fluitt never returned to work with Cabrini.

Ms. Durr's trial testimony supported Ms. Fluitt's testimony with regard to the first and last buckling incident of August 18. With regard to the first incident, she testified that she observed Ms. Fluitt leaving a patient's room, rubbing her knee and complaining that her knee was weak. She also testified that she observed Ms. Fluitt's left knee buckle as Ms. Fluitt walked toward the table used for charting work and that, when it buckled, she heard a popping sound. According to Ms. Durr, Ms. Fluitt "looked surprised and scared at the same time." She further acknowledged that, as the charge nurse for that shift, she was the person to whom Ms. Fluitt would have reported any accident. Although she did not recall completing an incident report on that day, she did confirm Ms. Fluitt's testimony that the oncolgy unit was often extremely busy with patients and that other things simply had to wait.[4]

The medical exhibits submitted at trial establish that Ms. Fluitt sought treatment for her left knee condition from three physicians and a chiropractor: Dr. Chris Rich, an Alexandria, Louisiana, orthopedic surgeon; Dr. Barry Henry, a Lafayette, Louisiana, orthopedic surgeon; Dr. Mohammad I. Shbeeb, an Alexandria, Louisiana, rheumatologist; and Dr. Kemp J. Nelson, an Alexandria, Louisiana chiropractor. Dr. Rich treated her with physical therapy and pain medication; Dr. Shbeeb saw her on only one occasion for evaluation at the request of Dr. Rich; Dr. Henry performed surgery on Ms. Fluitt's left knee and repaired a torn meniscus; and Dr. Nelson saw her on at least one occasion, August 26, 2002.[5] All of this medical

---

[4]Ms. Durr's testimony was not emphatic concerning the completion of any report. She credited her lack of memory on this point to the time that had lapsed since the accident.

[5]Whether Dr. Nelson saw and treated Ms. Fluitt more than one time is an issue on appeal.

evaluation and treatment occurred between Ms. Fluitt's first visit with Dr. Rich on August 20, 2002, and Dr. Henry's surgery on November 14, 2002. During this period, on August 26, 2002, Cabrini fired Ms. Fluitt for absenteeism.

### *Assignments of Error Numbers One and Two*

In asserting that the WCJ erred in concluding that Ms. Fluitt sustained a compensable injury on August 18, 2002, Cabrini directs us to inconsistencies established by the evidence which "cast[] serious doubt on [Ms. Fluitt's] version of the incident." In considering these assignments of error, we first note that "[t]he trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error." *Bruno v. Harbert Int'l Inc.,* 593 So.2d 357, 361 (La.1992).

Cabrini's primary argument in both of these assignments relates partially to Ms. Fluitt's actions [or inactions] in reporting the events of August 17 and 18, 2002, both to her employer and the healthcare providers. While there may have been inconsistencies created by the evidence presented, we find that they do not rise to the level of requiring a reversal of the WCJ's factual findings.

With regard to the reporting inconsistencies, Cabrini relies primarily on the testimony of its employee, Christa Book, who holds the position of employee health nurse. She is the person within Cabrini to whom accidents are supposed to be ultimately reported. According to Ms. Book, she had numerous conversations with Ms. Fluitt and Bruce Tassin, the hospital's risk management director, concerning a June 2002 incident wherein Ms. Fluitt was sprayed in the face with a chemical air

5

freshener.[6] She testified that she did not recall any reference to a knee injury during these conversations and that her first indication of an injury to Ms. Fluitt's knee came three months after the hospital had terminated Ms. Fluitt's employment. However, despite the fact that she is responsible for receiving claims and monitoring the progress of those claims, she acknowledged that she does not keep a log of her activities.

Ms. Fluitt's testimony concerning her discussions with Cabrini with regard to her knee injury was in stark contrast to that of Ms. Book. She testified that, when she awoke on August 19 with a swollen knee, she immediately attempted to obtain an appointment with Dr. Rich but that the first available appointment was not until August 20, 2002.[7] After leaving Dr. Rich's office,[8] she telephoned the hospital "house supervisor"[9] and informed her that Dr. Rich had recommended that she not return to work for three weeks and that the hospital needed to make arrangements to replace her. The house supervisor suggested that she telephone Ms. Book. According to Ms. Fluitt, she finally reached Ms. Book two days later and informed her by telephone of her injury and of the fact that she had little or no leave left because of the continued complications arising from the unresolved June 2002 claim. Ms. Fluitt testified that she requested that Ms. Book expedite both her June claim and

---

[6]Ms. Book testified that, with regard to the spray incident, the hospital did not deny the claim but "questioned" it.

[7]Ms. Fluitt initially testified that her initial appointment did not occur until August 21, 2002. However, Dr. Rich's records reflect that his initial examination occurred on Tuesday, August 20, 2002. Later in her testimony, Ms. Fluitt referred to the appointment as having occurred on Tuesday of that week. Thus, given the record as a whole, we conclude that the initial appointment occurred on Tuesday, August 20, 2002.

[8]The record reflects that Dr. Rich's office is located immediately across the street from Cabrini.

[9]The record does not specifically identify this person.

6

the current claim because she needed the workers' compensation benefits to support her family.

The next day after her initial appointment with Dr. Rich, Ms. Fluitt received a telephone call from Joan Wilson, her immediate supervisor in her work unit. Ms. Fluitt testified that she related the history of her knee injury to Ms. Wilson and informed her that Dr. Rich had recommended that she not return to work for three weeks. Thus, in Ms. Fluitt's view, Cabrini obviously understood her situation. However, she testified that thereafter she began to have difficulties communicating with Ms. Book. According to Ms. Fluitt, Ms. Book simply refused to discuss her knee injury and refused to accept it as a workers' compensation claim. She testified that she asked Ms. Book on several occasions to telephone Dr. Henry but that Ms. Book refused. Dissatisfied with Ms. Book's attitude, Ms. Fluitt then contacted Mr. Tassin in an effort to obtain some consideration of her claims. That attempt, according to Ms. Fluitt, was also in vain.

Cabrini also asserts that the medical exhibits in evidence reflect inconsistencies which undermine Ms. Fluitt's credibility to the extent that the WCJ erred in finding that a compensable accident occurred. With regard to Dr. Rich, Cabrini points to the fact that on the doctor's patient medical history form she wrote "unknown" in the blank concerning how the injury arose and that Dr. Rich's notes reflect a history of pain for the week before the appointment with no known injury.

Dr. Nelson's records reflect that Ms. Fluitt had been seeing him professionally for a number years for various ailments and that he saw her twice, August 26 and 28, 2002, for her current knee injury. The doctor's typed notes with regard to those visits make no reference to any history obtained other than the complaint that she suffered

7

with moderate stiffness, soreness, and pain in the left knee. However, Cabrini directs us to two other places in Dr. Nelson's records that seem to refer to treatment for a previous knee injury. Those include recorded visits to Dr. Nelson on July 21, 2000, and January 19, 2001.[10] The July 21 record contains a form which lists Ms. Fluitt as the patient and includes an image of an erect human body facing forward and backward. The obvious purpose of the form is to have the patient, or someone on his or her behalf, mark on the body the places he or she suffers pain. Cabrini points to an "X" which appears on the back portion of the left knee as evidence of a prior history of knee difficulties.[11] Additionally, Cabrini directs us to the January 19, 2001 form which lists as the location of pain "Lt Knee & Rt hip, 2 fingers on left hand." However, while it is made a part of Ms. Fluitt's records, it contains no notation in the space reserved for the patient's name.

Ms. Fluitt explained that, when Dr. Rich asked her whether the claim was one covered by workers' compensation, she told him that, because she was already in a dispute with the hospital over another claim which the hospital would not recognize as a workers' compensation claim, she was doubtful that Cabrini would accept this one. Therefore, she suggested to Dr. Rich that the claim should be carried under her husband's private insurance. According to Ms. Fluitt, Dr. Rich informed her in the initial examination that he believed she suffered from a torn meniscus. He suggested that she undergo an MRI at Cabrini and indicated that he would schedule it

---

[10]Part of the problem in evaluating Dr. Nelson's records is that he has changed the format over the years. The July 21, 2000 entry is on a preprinted form entitled "PATENT'S DAILY PROGRESS REPORT/TREATMENT NOTES/DOCUMENTATION/SOPE NOTES." Before January 19, 2001, the doctor used a half-page preprinted form that provided for basic information regarding complaints (subjective and objective), assessment, and treatment. By August of 2002, Dr. Nelson had begun to prepare individual after-the-fact notations of his findings and treatment.

[11]The body contains an "X" at the rear left buttock, the left front foot, and the left side of the waistline as well.

8

immediately. Additionally, according to Ms. Fluitt, Dr. Rich informed her that he would schedule her for surgery on Thursday of that week. She telephoned Cabrini on Wednesday and discovered that no surgery had been scheduled for Thursday. She then contacted Dr. Rich's office and was informed that he wanted to await the results of the MRI. That test was performed on Wednesday afternoon. The results of the MRI proved to be inconclusive for a torn meniscus, and Dr. Rich chose to treat Ms. Fluitt's complaints with physical therapy and pain medication.

With regard to Dr. Nelson's records, Ms. Fluitt denied having any prior knee difficulties and explained the entries as a mistake. According to Ms. Fluitt, her husband, Michael D. Fluitt, Sr., had been treated for a left knee injury by Dr. Nelson. Mr. Fluitt testified that his wife suffered no prior knee difficulties, that both he and his wife had been under the care of Dr. Nelson prior to her August 2002 accident, and that it was he who had the left knee complaints. The WJC found Dr. Nelson's records to be inconclusive and made the specific factual finding that Ms. Fluitt "was doing her job well until the -- until August -- mid-August of 2002."

In attempting to evaluate Cabrini's argument, we are not favored with the testimony of either Dr. Rich or Dr. Nelson. Rather, with regard to Dr. Rich, we must evaluate this issue by comparing Ms. Fluitt's version of what transpired in the office visit to the actual notations in the medical records. In doing so, we acknowledge the correctness of Cabrini's assertions concerning the inconsistencies between Ms. Fluitt's testimony and the notations in the medical records. However, we also note that the MRI report of August 20, 2002, contains entries which suggest that traumatic etiology of the injury was considered. The report states that the MRI was performed because of a suspected meniscal tear. Under the section of the report entitled

9

"FINDINGS," the report states that "THERE IS A SMALL FOCUS OF MARROW EDEMA INVOLVING THE MEDIAL MARGIN OF THE MEDIAL FEMORAL CONDYLE. *QUESTION HISTORY OF RECENT TRAUMA.*" (Emphasis added.) Under that same section, the report further states that "NOTE IS MADE OF A REGIONAL ZONE OF EDEMA AROUND THE MEDIAL COLLATERAL LIGAMENT. *THIS SUGGESTS SOME UNDERLYING LIGAMENTOUS STRAIN ALTHOUGH A DEFINITE LIGAMENTOUS TEAR IS NOT IDENTIFIED.*" (Emphasis added.) With regard to Dr. Nelson, we are left with a record that contains no reference to the patient's history.

In the oral reasons for judgment, the WCJ evaluated the evidence and made extensive findings of fact. The WCJ specifically recognized the conflicting testimony of Ms. Fluitt and Ms. Book, but also noted that the hospital made no effort to discredit the testimony of Ms. Durr. Citing the supreme court decision in *Bruno*, 593 So.2d 357, and noting that Cabrini's attack on Ms. Fluitt related primarily to the supposition that her claim was based solely on her testimony, the WCJ stated that the evidence established otherwise. Pointing to Ms. Durr's testimony, the various notations concerning Ms. Fluitt's knee injury in her personnel file, and the fact that Ms. Fluitt did indeed suffer a meniscus tear as originally suspected by Dr. Rich, the WCJ discounted the other contentions of Cabrini and concluded that Ms. Fluitt had carried her burden of proof.

"[T]he plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence." *Bruno*, 593 So.2d at 361. Additionally,

> A worker's testimony alone may be sufficient to discharge this burden
> of proof, provided two elements are satisfied: (1) no other evidence

10

discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends. Malone & Johnson, *supra; Nelson* [*v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. Corroboration may also be provided by medical evidence. *West, supra.*

In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of the testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987). The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. *Gonzales v. Babco Farms, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988) (collecting cases). Indeed, the manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court's decision is based solely upon written reports, records or depositions. *Virgil v. American Guarantee and Liability Insurance Co.*, 507 So.2d 825 (La.1987).

*Id.*

Applying the rationale in *Bruno*, we find no manifest error in the WCJ's factual determinations. Therefore, we find no merit in Cabrini's first two assignments of error.

### Assignments of Error Numbers Three, Four, and Five

In these assignments of error, Cabrini addresses the issue of Ms. Fluitt's disability, if any, arising from the accidents of August 17 and 18, 2002, and the payment of benefits for that disability. Because they are interrelated, we will consider them together.

Concerning the issue of disability, the WCJ stated the following in its reasons for judgment:

The employer offered some evidence that Ms. Fluitt is not disabled because she has gone on mission trips to South Africa, she does household chores, she participates in Church activities, and she goes deer hunting. But the burden is on the employer to show that Ms. Fluitt can earn 90 percent of her pre-injury wages. She testified she had looked for work when she was unemployed. According to Banks versus Industrial Roofing and Sheet Metal Works, Incorporated, a Supreme Court case, 696 So.2d, Page 551, the employer must show three minimum things, the existence of a suitable job within the claimant's physical capabilities and within the claimant's or the employer's community or reasonable geographic region, the amount of wages that an employee with the claimant's experience and training can be expected to earn in that job and an actual position available for that particular job at the time that the claimant received notification of the job's existence. I recall some testimony that – from the hospital that Ms. Fluitt should have been aware that the hospital always accommodates it's [sic] employees when they have job-related restrictions. However, there was no evidence introduced by the hospital that they ever offered any such position to the employee, Ms. Fluitt. Furthermore, in the case of Banks, the Court stated that, "An employer cannot point to a claimant's lack of effort in lieu of the employer's presenting sufficient evidence of job availability within the claimant's physical capabilities." And the last restriction we have from Dr. Henry is a light-work restriction. We've already read the job description for an oncology nurse which, to this Court's view, indicates activities beyond a light-duty restriction.[12] So Ms. Fluitt is entitled to SEB benefits from December 17, 2002 with a zero earning capacity through today's date and continuing until such time as it changes in accordance of the law.

In its third assignment of error, Cabrini correctly points out that the burden of proof is on Ms. Fluitt to establish entitlement to TTDs [La.R.S. 23:1221(1)] as well as SEBs [La.R.S. 23:1221(3)]. In making its argument that the WCJ shifted the burden of proof to it, Cabrini refers to the oral reasons for judgment wherein the WCJ stated that "[Cabrini has] offered no contrary evidence to convince this Court that Ms. Fluitt did not sustain an accident" in the course and scope of her employment with the hospital. We do not find this comment supportive of Cabrini's position. Specifically,

---

[12]The WCJ earlier in the reasons for judgment described the job duties as follows: "May require lifting a [sic] 50 to 100 pounds. Work requires sitting, bending, stretching and walking. May require prolonged standing and walking, lifting and moving patients, equipment and supplies. Subject to danger of infection from disease-bearing specimens, exposed to odorous chemicals and specimens. Exposed to all patient elements: infectious diseases, chemicals radiation, sharp tools/instruments, antineoplastic agents, combative patients/visitors and electric shock."

the comment occurred in the context of *causation* of the accident, and not in the context of establishing the existence of an accident or the nature and extent of disability. In fact, at that point, the WCJ had not yet discussed the evidence with regard to the nature and extent of disability. Additionally, the WCJ had acknowledged that Ms. Fluitt, not Cabrini, had the burden of proving the existence of a work accident, stating: "Ms. Fluitt bears the burden of proving by [a] preponderance of evidence that she suffered an accident in the course and scope of her employment and that the incident qualifies as an accident."

Rather, in making the comment at issue, the WCJ was responding to Cabrini's assertion that chiropractic records indicated that Ms. Fluitt had knee problems prior to the alleged work accident. In responding to the assertion, the WCJ found the chiropractic records inconclusive and rejected that evidence as a basis to deny Ms. Fluitt's claim. It appears that, in the context of *causation*, the WCJ's comment was simply an observation that, in light of the uncontradicted objective evidence of a physical injury and the fact that Ms. Fluitt was able to perform her job prior to the alleged accident, Cabrini had not presented evidence to show that some other event was responsible for the injury.

Clearly, our jurisprudence provides that a claimant's disability is presumed to have been caused by an accident, if before the accident the claimant was in good health but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves, provided that the medical evidence establishes a reasonable possibility of a causal connection between the accident and the disabling condition. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979). In fact, "[o]nce the disabled employee establishes the presumption of a causal

13

relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue." *Walton v. Normandy Vill. Homes Ass'n, Inc.*, 475 So.2d 320, 325 (La.1985). Accordingly, we find no error on the part of the WCJ, and we reject Cabrini's assignment of error in that regard.

In its fourth assignment of error, Cabrini argues that the WCJ erred in awarding indemnity benefits and medical expenses. Essentially, this argument is a reassertion of Cabrini's contention that the evidence does not support a finding of a work-related accident. Because we have already addressed and rejected Cabrini's argument in that regard, we will offer no further discussion here.

Finally, Cabrini complains of the WCJ's award of SEBs based on a zero earning capacity. Cabrini asserts that, "[e]xcept for the fact that she was terminated for excessive, unexplained absences, claimant admitted that her job could have been modified." Cabrini also asserts that Ms. Book "testified also that the hospital accommodates modified duty."

Regarding Ms. Fluitt's initial burden of proof, the record reflects that she was released for only light-duty work, and there is no dispute that she cannot return to her prior job duties. Thus, it was incumbent upon Cabrini to prove, "by a preponderance of the evidence, that [Ms. Fluitt was] physically able to perform a certain job and that the job was offered to [her] or that the job was available to [her] in [her] or [Cabrini's] community or reasonable geographic region." *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840, p. 9 (La. 7/1/97), 696 So.2d 551, 556. The fact that Cabrini has the capability of modifying a job for a former employee is not

14

tantamount to a job offer or job availability. Thus, as Cabrini did not meet its burden of proof, the WCJ did not err in awarding SEBs based on a zero earning capacity.

## DISPOSITION

For the foregoing reasons, we affirm the judgment below in all respects at Cabrini's cost.

**AFFIRMED.**

**JANICE FLUITT**

**VERSUS**

**CHRISTUS HEALTH CENTRAL LOUISIANA D/B/A ST. FRANCES CABRINI HOSPITAL**

**GENOVESE, J., dissents.**

The majority views this case as a manifest error case. The record, however, indicates an unwitnessed workers' compensation accident with an abundance of conflicting testimony and without corroborating medical evidence. This is not a case of two permissive views of the evidence, but rather a failure to prove the occurrence of a work-related accident. Therefore, I respectfully dissent and would reverse the judgment below.